# In the United States Court of Federal Claims

No. 18-1746C
(Filed: August 27, 2021)
**FOR PUBLICATION**

```
***************************************
PEYTON JOSHUA O'HARE,                 *
                                       *
                     Plaintiff,        *
                                       *
v.                                     *
                                       *
THE UNITED STATES,                     *
                                       *
                     Defendant.        *
                                       *
***************************************
```

 *Colin P. Watson*, Covington & Burling LLP, with whom were *Scott A. Freling, Kevin J. Matta,* and *Paul Rowley,* Covington & Burling LLP, and *Bart Stichman, Esther Leibfarth, Rochelle Bobroff*, and *David Sonenshine*, National Veterans Legal Services Program, all of Washington, D.C., for Plaintiff.

 *William P. Rayel*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, Department of Justice, *Robert E. Kirschman, Jr.*, Director, *Martin F. Hockey, Jr.*, Acting Director, *Elizabeth M. Hosford*, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice and *Lt. Adam Sitte*, General Litigation Division, Office of the Judge Advocate General, Department of the Navy, all of Washington, D.C., for Defendant.

## OPINION AND ORDER

 Plaintiff Peyton Joshua O'Hare, a former hospital corpsman in the United States Navy, challenges a decision of the Board for Correction of Naval Records ("BCNR" or "Board") denying his request for medical retirement. The parties filed cross-motions for judgment on the administrative record under RCFC 52.1(c).[1] The

---

[1] Def.'s Mot. for J. on the Administrative R. (ECF 21) ("Def.'s MJAR"); Pl.'s Cross-Mot. for J. on the Administrative R. & Opp. (ECF 22) ("Pl.'s MJAR"); Def.'s Resp. & Reply (ECF 25); Pl.'s Reply (ECF 26).

parties filed supplemental briefs on jurisdiction at the Court's request,[2] and the Court held oral argument on all issues.[3] The matter is now ripe for disposition.

This Court has jurisdiction over Mr. O'Hare's claim. However, substantial evidence supports the BCNR's finding that he was fit for continued service when he was discharged. Accordingly, the Court **GRANTS** Defendant's motion and **DENIES** Mr. O'Hare's cross-motion. The case is **DISMISSED**.

## BACKGROUND

### I. The Disability Retirement Process

A military service member may receive disability retirement if the secretary of his branch finds that he is "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay," and also that:

> (1) based upon accepted medical principles, the disability is of a permanent nature and stable;
>
> (2) the disability is not the result of the member's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence; and
>
> (3) [*inter alia*]—
>
> > …
> >
> > (B) the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs [("VA")] at the time of the determination; and …
> >
> > …
> >
> > (iv) the disability was incurred in line of duty after September 14, 1978.

10 U.S.C. § 1201(a)–(b); *see also* 10 U.S.C. § 101(a)(9).

"'Fit' and 'Unfit' are terms of art[.]" *O'Brien v. United States*, 120 Fed. Cl. 85, 93 (2015). Under Department of Defense regulations, determinations of fitness and unfitness hinge on whether a service member can perform his "duties": "A Service member shall be considered unfit when the evidence establishes that the member,

---

[2] Pl.'s Suppl. Br. (ECF 31); Def.'s Suppl. Br. (ECF 32); Pl.'s Suppl. Resp. (ECF 34); Def.'s Suppl. Resp. (ECF 33); *see* Order (ECF 30) (requesting supplemental briefs).
[3] Tr. of Oral Arg. (ECF 36).

due to physical disability, is unable to reasonably perform the duties of his or her office, grade, rank, or rating (hereafter called duties)[.]" *See* Department of Defense Instruction ("DoDI") 1332.38, E3.P3.2.1; *see also* Secretary of the Navy Instruction ("SECNAVINST") 1850.4E encl. 1, § 1004(c)(2)(a) (providing that to support a finding of unfitness, "the medical disease or condition underlying the diagnosis [must] actually interfere[] significantly with the member's ability to carry out the duties of his or her office, grade, rank or rating"). Fitness to separate from the military is evaluated by the same standard as fitness for duty. Department of the Navy, Manual of the Medical Department ("MANMED") Art. 15-21(1).

The member's *actual* performance of his *particular* duties is the key factor. A member's performance can outweigh medical evidence of unfitness: "If the evidence establishes that the Service member adequately performed his or her duties until the time the Service member was referred for physical evaluation, the member may be considered fit for duty even though medical evidence indicates questionable physical ability to continue to perform duty." *See* DoDI 1332.38, E3.P3.3.3; SECNAVINST 1850.4E encl. 3, § 3303(c) (similar). Likewise, a member's fitness depends not on ability to carry out the generic military activities of a hypothetical service member, but the tasks that he is personally expected to be able to perform, *i.e.*, "the duties of *his or her* office, grade, rank, or rating[.]" *See* DoDI 1332.38, E3.P3.4.1.1 (emphasis added).

A member's ability to deploy involves additional considerations. When a service member's duties require deployment, the member's capability for deployment is relevant to fitness. *See* DoDI 1332.38, E3.P3.4.1.3. But it is not dispositive of fitness or unfitness: "Inability to perform the duties of [a member's] office, grade, rank, or rating in every geographic location and under every conceivable circumstance will not be the sole basis for a finding of unfitness." *Id.*

The Department of Defense ordinarily processes medical disability retirements of active service members through the disability evaluation system ("DES"). *See generally* Department of Defense Directive 1332.18; DoDI 1332.38. The threshold for DES referral is set by regulation. An earlier version of DoDI 1332.38 stated:

> It is not within the mission of the Military Departments to retain members on active duty or in the Ready Reserve to provide prolonged, definitive medical care when it is unlikely the member will return to full military duty. Service members shall be referred into the DES as soon as the probability that they will be unable to return to full duty is ascertained and optimal medical treatment benefits have been attained. All members shall be referred for evaluation within one year of the

> diagnosis of their medical condition if they are unable to return to military duty.

DoDI 1332.38, E3.P1.6.1 (Nov. 14, 1996) (citation omitted). That version, however, was superseded in 2008. *See* Under Sec'y for Def. for Personnel & Readiness, Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act of 2008 (Oct. 14, 2008). The revised provision reads:

> When a competent medical authority determines a Service member has one or more condition(s) which is suspected of not meeting medical retention standards, he or she will refer the Service member into the DES at the point of hospitalization or treatment when a member's progress appears to have medically stabilized (and the course of further recovery is relatively predictable) and when it can be reasonably determined that the member is most likely not capable of performing the duties of his office, grade, rank or rating. Referral will be within 1 year of being diagnosed with a medical condition(s) that does not appear to meet medical retention standards, but may be earlier if the examiner determines that the member will not be capable of returning to duty within 1 year.

DoDI 1332.38, E3.P1.6.1 (Oct. 14, 2008).

According to instructions issued by the Department of Defense and the Secretary of the Navy, the first step of the DES is referral to a medical evaluation board ("MEB"). DoDI 1332.38, E3.P1.1.1; SECNAVINST 1850.4E encl. 3, § 3102(a). That is followed, if necessary, by referral to a physical evaluation board ("PEB"). DoDI 1332.38, E3.P1.1.2; SECNAVINST 1850.4E encl. 3, § 3102(c). The PEB then makes a determination of disability "on behalf of the Secretary of the Navy[.]" SECNAVINST 1850.4E encl. 1, § 1004(a).

The Secretary of the Navy has provided that determination by the DES of eligibility for medical retirement hinges on the member's fitness to perform his duties:

> The sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay. Each case is considered by relating the nature and degree of physical disability of the member to the requirements and duties that member may reasonably be expected to perform in his or her office, grade, rank or rating.

SECNAVINST 1850.4E encl. 3, § 3301. Several factors guide the DES's evaluation, including the risk of the medical condition to the member or other members, the requirements the condition may impose on the military, and the nature of the member's established duties for the remainder of his reserve obligation. *Id.* § 3302(b). Members are, however, presumed fit. *Id.* § 3305.

A member who believes he was erroneously denied disability retirement may petition the BCNR for correction of his military record. *See Chambers v. United States*, 417 F.3d 1218 (Fed. Cir. 2005) (discussing the BCNR's Army counterpart). The BCNR grants relief upon finding an "error or injustice." 10 U.S.C. § 1552(a)(1). The BCNR may also "make a disability determination in the first instance." *Sawyer v. United States*, 930 F.2d 1577, 1581 (Fed. Cir. 1991). Members who are dissatisfied with the decision of the BCNR may obtain judicial review. *Chambers*, 417 F.3d at 1224–25.

## II. Facts

Mr. O'Hare enlisted with the Navy in May 2006 as a hospital corpsman. Administrative Record ("AR") 29, 32. He served in that capacity with United States Marine Corps units in Iraq and Afghanistan, providing medical services — often in horrific circumstances — to servicemembers and civilians alike. AR 71, 85. His tour in Afghanistan followed his return from Iraq, where he received glowing evaluations of his service and was recommended for early promotion. AR 840–41.

On September 18, 2009, during his deployment to Afghanistan, the vehicle Mr. O'Hare and three Marines were riding in struck an improvised explosive device. AR 85, 844. Mr. O'Hare's head hit the roof of the vehicle, but — despite his injury — he treated and evacuated the Marines. A medical evaluation performed soon after the explosion revealed that Mr. O'Hare suffered a "grade 2" concussion, which is considered a traumatic brain injury ("TBI") under Department of Defense regulations. AR 72, 844, 907; Directive Type Memorandum 09-033, Glossary (June 21, 2010). Mr. O'Hare was awarded the Purple Heart.

After his injury, Mr. O'Hare was placed on limited duty for two weeks, during which he did not perform his normal hospital corpsman duties. AR 85. That period of limited duty was extended to three weeks, after which Mr. O'Hare was apparently returned to full duty in an assistant's role with the battalion aid station and company. AR 85.

Mr. O'Hare returned to the United States in November 2009. AR 266. He was given post-deployment medical evaluations where he reported continuing physical and psychological symptoms from his injury, but an overall feeling of good health, and no difficulty performing his duties. AR 850–51, 855, 857, 866–70. He received a

diagnosis of TBI with persistent symptoms. AR 857. He later received a diagnosis of PTSD as well. AR 933.

Over the following months, during which Mr. O'Hare had regular contacts with the military medical system, the nature and severity of his symptoms varied. *See* AR 867 (medical evaluation in which Mr. O'Hare reported that his health was "Fair" and that it was "[s]omewhat difficult" for him to perform his duties); AR 912 (VA evaluation in which he reported he could "still work as a hospital corpsman and [was] having no problems doing that"). Mr. O'Hare received ongoing evaluation and treatment over that period, though the parties dispute the seriousness of Mr. O'Hare's symptoms.

In the United States, Mr. O'Hare was assigned to work in a naval hospital performing administrative duties, AR 937–38, and was placed on temporary limited duty a second time in July 2010. AR 91. His temporary limited duty was scheduled to end in January 2011. AR 91. But while still on limited duty in October 2010, Mr. O'Hare declined to reenlist and was discharged to the naval reserve. AR 57. He underwent a separation physical performed by a nurse practitioner, who released him "w/o limitations." AR 1042–45. His reentry code was RE-1, AR 57, meaning he was "[e]ligible for reenlistment." Department of the Navy, Bureau of Personnel Instruction ("BUPERSINST") 1900.8D encl. 2. Mr. O'Hare submitted a disability claim to the VA, which assigned him a 40 percent disability rating for TBI-related cognitive impairment. AR 749.

Mr. O'Hare continued to receive strong evaluations for his performance after his injury. His first post-injury review, which covered the period of June 2009 to June 2010, praised him in multiple respects — including for his conduct at the time of his injury — and recommended him for early promotion. AR 71–72. His final evaluation in October 2010, covering his hospital work after deployment through discharge, recommended him for retention and early promotion as well. AR 937–38.

### III. Procedural History

Mr. O'Hare petitioned the BCNR for disability retirement in 2014.[4] AR 83–84. The BCNR issued a short order denying relief two years later. AR 80–81. In 2018, Mr. O'Hare filed suit in this Court, claiming that the Navy erred by neither referring him to the DES nor granting him medical retirement.

The government filed an unopposed motion to remand for the BCNR to consider the allegations in the Complaint, which the Court granted the same day. *See*

---

[4] The petition was untimely, but the BCNR waived the defect. *See* AR 80, 82.

Def.'s Unopposed Mot. for a Voluntary Remand at 1–2 (ECF 9); Order at 1 (ECF 10). The BCNR received briefing from Mr. O'Hare and obtained advisory opinions from the Council of Review Boards. AR 818–1029, 1031–33, 1052, 1054–59. In 2019, the BCNR issued a second order denying relief. AR 811–15.

First, the Board determined that the Navy was not required to refer Mr. O'Hare to DES processing — apparently relying on a superseded version of the DES referral regulation cited in Mr. O'Hare's briefing:

> As you quoted in your brief to this Board, that instruction requires Servicemembers to be referred to the DES "as soon as the probability that they will be unable to return to full duty is ascertained and optimal medical treatment benefits have been attained." After reviewing the evidence, however, the Board concluded that you never reached that threshold for referral to the DES.

AR 812. In support of that conclusion, the BCNR cited Mr. O'Hare's June and October 2010 performance evaluations, which showed that Mr. O'Hare "professionally performed at the highest levels" despite his conditions, including when on limited duty. AR 812–13. The Board also "analyzed [Mr. O'Hare's] performance before and after [he was] placed on limited duty to determine whether [his] TBI or PTSD made it improbable that [he] would return to full duty." AR 813. It concluded that although Mr. O'Hare was on limited duty at the time of his separation from the military, the fact that his duty restrictions were temporary "shows that [Mr. O'Hare's medical providers] did not consider [his] conditions to be permanently limiting, and with continued treatment, may have returned [him] to full duty status, including operational duty." AR 813.

The BCNR acknowledged that Mr. O'Hare "filled a clerical role" in the naval hospital after his deployment, but explained that such roles are within the duties of hospital corpsmen like Mr. O'Hare: "Because the Navy assigns corpsmen to naval hospitals to perform clerical and administrative duties, including duties similar to the ones you performed while on limited duty, your assignment to a non-operational role does not show you were unfit for continued naval service." AR 813.

Second, the Board determined that there was no "error or injustice" in discharging Mr. O'Hare without medical retirement. AR 813–14. The Board noted that (1) Mr. O'Hare "underwent a separation physical and [was] medically cleared for separation," later receiving "a reenlistment code of RE-1," and (2) his October 2010 performance evaluation showed he was "successfully performing the duties of [his] office, grade, rank, or rating up to [his] date of discharge." AR 814. The Board repeated that Mr. O'Hare's "temporary limited duty and non-operational role at the

naval hospital do not establish that [he was] unfit for continued naval service." AR 814.

The author of an advisory opinion obtained by the Board researched Mr. O'Hare's post-military employment and learned from his profile on LinkedIn — a well-known professional networking website, *see* Fed. R. Evid. 201 — that Mr. O'Hare obtained employment as a technician in an emergency room the month after his discharge, and later as a registered nurse. AR 812, 814, 1033, 1048. The BCNR acknowledged that it "lacked specific information regarding [Mr. O'Hare's] performance," but concluded nonetheless that his "ability to secure employment in an Emergency Room and become a Registered Nurse reinforces the evidence in [his] performance evaluation that, at the time of [his] discharge, [his] TBI and PTSD did not significantly interfere with [his] ability to carry out [his] professional duties." AR 814.

## DISCUSSION

### I. Jurisdiction

To reach the merits of the case, I must first determine that the Court has jurisdiction over Mr. O'Hare's claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). I conclude that jurisdiction exists.

Mr. O'Hare's claims fall within this Court's Tucker Act jurisdiction. *See* 28 U.S.C. § 1491(a)(1). The Tucker Act does not create a substantive right of action, *United States v. Testan*, 424 U.S. 392, 398 (1976), so a party seeking to bring a Tucker Act suit in this Court must point to a money-mandating statute or regulation. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Mr. O'Hare's claims arise under 10 U.S.C. § 1201, which is a money-mandating statute. *See Fisher v. United States*, 402 F.3d 1167,1174 (Fed. Cir. 2005) (citing *Sawyer*, 930 F.2d 1577). As the allegedly aggrieved party, Mr. O'Hare has standing to bring those claims.

Whether Mr. O'Hare's claims are timely is a harder question. All claims before this Court are barred if filed more than six years after the claim first accrues. 28 U.S.C. § 2501. "[T]he special statute of limitations governing the Court of Federal Claims requires" that timeliness be considered jurisdictional. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132 (2008).

Generally, the six-year statute of limitations on a disability pay case runs from "[t]he decision by the first statutorily authorized board that hears or refuses to hear the claim[.]" *Chambers*, 417 F.3d at 1224; *see Friedman v. United States*, 310 F.2d 381, 396 (Ct. Cl. 1962); 28 U.S.C. § 2501. But there is an exception when "the veteran's knowledge of the existence and extent of his condition at the time of his

discharge [is] sufficient to justify concluding that he waived the right to board review of the service's finding of fitness by failing to demand a board prior to his discharge." *Chambers*, 417 F.3d at 1226 (quoting *Real v. United States*, 906 F.2d 1557, 1562 (Fed. Cir. 1990)). The *Real* exception applies when the service member knew, "at the time of his separation" from the military, "that he was entitled to disability retirement due to a permanent disability that was not a result of his intentional misconduct and was service-connected." *Chambers*, 417 F.3d at 1226; *see* 10 U.S.C. § 1201(a)–(b). When the exception applies, the statute of limitations runs from the time of discharge. The Court ordered the parties to address that rule. *See* Order (ECF 30).

Although the issue is close, I conclude that Mr. O'Hare did not have sufficient knowledge at the time of discharge for his claim to have accrued. Some facts weigh in favor of the statute of limitations running from Mr. O'Hare's discharge. Mr. O'Hare — unlike the plaintiffs in *Chambers* and *Real* — was aware of his injury and of his diagnosis. AR 85–86; *see Chambers*, 417 F.3d at 1226–27; *Real*, 906 F.2d at 1563. He was on limited duty at the time of discharge, and he appears to have considered or expected DES processing. AR 86, 1046. Nonetheless, the record does not show that he *knew* he had a *permanent* disability that *entitled* him to disability retirement. *Chambers*, 417 F.3d at 1226. Rather, he was able to perform his assigned duties, at least at certain times, and had reason to expect continued recovery. Even assuming he was in fact disabled, he likely did not "underst[and] the full extent" of his injury. *Real*, 906 F.2d at 1563; *see also Johnson v. United States*, 123 Fed. Cl. 174, 179 (2015) (finding no statute of limitations accrual where plaintiff "never stopped" performing his duties and only had "temporary" medical restrictions), *aff'd*, 675 F. App'x 1011 (Fed. Cir. 2017).

The statute of limitations thus accrued when the BCNR issued its first decision on February 22, 2016. AR 80–81. The case was filed on November 9, 2018, less than six years later. *See* Compl. (ECF 1). Mr. O'Hare's claim is not time-barred.

## II. Merits

### A. Legal Standards

When resolving motions for judgment on the administrative record under RCFC 52.1(c), this Court proceeds "as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005); *see also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012). The Court reviews decisions of military record correction boards under the standards of the Administrative Procedure Act. *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009); *see* 5 U.S.C. § 706.

Especially when it comes to fitness for military service — which is not a "judicial province," *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) — that standard of review is narrow. This Court "may appropriately decide whether the military followed [its] procedures[.]" *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993); *see also Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). Moreover, while it may not "reweigh[] the evidence" before the BCNR, *see Heisig*, 719 F.2d at 1157, the Court may consider whether the Board's decision "was based on a consideration of the relevant factors," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)), and was "supported by substantial evidence," *Heisig*, 719 F.2d at 1157; *see also Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) (stating that courts "may not substitute [their] judgment for that of [the agency]," but instead look to ensure the agency engaged in a reasonable decision-making process).

To be supported by "substantial evidence," the Board's decision must be based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). If the BCNR complied with the necessary procedures and reached a decision rationally supported by substantial evidence, it must be upheld. *Stine v. United States*, 92 Fed. Cl. 776, 791 (2010), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011).

### B. The BCNR's Denial of Disability Retirement Was Supported by Substantial Evidence

Mr. O'Hare argues that the BCNR erred in determining that he was not eligible for medical retirement at the time of his separation. Medical retirement, as explained above, is governed by 10 U.S.C. § 1201, which requires (in relevant part) that a disability (1) render a service member "unfit to perform the duties of [his] office, grade, rank, or rating" and (2) be "of a permanent nature and stable." 10 U.S.C. § 1201(a), (b)(1). The BCNR relied on several facts in finding that standard unmet.[5] AR 813–14. The question is whether those facts comprise "such relevant evidence as a reasonable mind might accept as adequate to support [the Board's] conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison*, 305 U.S. at 229). I conclude that they do.

---

[5] As discussed below, the Board relied on other facts to conclude that the Navy was not required to grant Mr. O'Hare DES processing. I shall assume that the Board did not intend to rely on those facts for its conclusion that Mr. O'Hare was fit at the time of discharge. *See Verbeck v. United States*, 97 Fed. Cl. 443, 460 n.25 (2011) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

*1. Separation Physical*

The BCNR relied on the fact that Mr. O'Hare "underwent a separation physical and [was] medically cleared for separation" with a reenlistment code of RE-1, AR 814, designations which meant he was considered fit for duty at the time of discharge. *See* MANMED Art. 15-21(1); BUPERSINST 1900.8D encl. 2. Mr. O'Hare objects that his separation physical was "prepared by a nurse practitioner rather than a neurologist or neuropsychologist, or even a psychiatrist." Pl.'s MJAR at 31. As Mr. O'Hare's counsel candidly admitted at argument, there is nothing *procedurally* wrong with a nurse practitioner performing a separation physical. Tr. of Oral Arg. at 64; MANMED, Article 15-4(1); Department of the Navy, Bureau of Medicine and Surgery Instruction 6320.66E, § 5(14). Rather, Mr. O'Hare objects to the probative value of a physical performed by a non-specialist. Tr. of Oral Arg. at 64–66.

Reasonable individuals might debate how much weight to give a nurse practitioner's evaluation, especially when it comes to conditions like Mr. O'Hare's TBI and PTSD. But this Court does not run the Navy, *see Dodson v. U.S. Gov't, Dep't of Army*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (citing *Orloff v. Willoughby,* 345 U.S. 83, 93 (1953)), and "courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions," particularly on a question that touches on military fitness. *Heisig*, 719 F.2d at 1156.[6] "[I]t would be singularly inappropriate to second-guess the judgment of … military medical officers[.]" *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988); *see also O'Brien*, 120 Fed. Cl. at 93 (explaining that the Court "will not substitute its judgment for that of either the military review board or the decisions made by qualified medical evaluators").

The Navy, as part of its authority to determine the fitness of its members, has provided that fitness to separate may be evaluated by a nurse practitioner. The Board could therefore, in its discretion, rely on the findings of a procedurally sound separation physical conducted by a nurse practitioner to conclude that Mr. O'Hare was fit for separation.

*2. October 2010 Fitness Report*

The BCNR found that Mr. O'Hare's final fitness report, completed in October 2010, showed that he was "successfully performing the duties of [his] office, grade,

---

[6] There might, theoretically, be circumstances where a separation physical is so facially unreliable and so inconsistent with other medical evidence that no "reasonable mind" would rely on it. *Richardson*, 402 U.S. at 401. That is not the case here, however, where neurologists examined Mr. O'Hare and did not refer him to DES. AR 94, 200.

rank, or rating up to [his] date of discharge." AR 814. Mr. O'Hare raises several arguments against that conclusion.

Mr. O'Hare argues that the report covers a period when he was performing only administrative work in a hospital, and so cannot show that he was fit to perform the duties of a hospital corpsman. But the Board determined that in performing administrative tasks, Mr. O'Hare *was* working within the scope of his duties. It found that "the Navy assigns corpsmen to naval hospitals to perform clerical and administrative duties, including duties similar to the ones [Mr. O'Hare] performed while on limited duty," meaning his "assignment to a non-operational role does not show [he was] unfit for continued naval service." AR 813. That finding is consistent with official written descriptions of a hospital corpsman's duties.[7] As the BCNR also noted, regulations contemplate that a service member can be fit for duty even when unable to perform his duties in all locations and circumstances: "[I]nability to perform the duties of his or her office, grade, rank, or rating in every geographical location and under every conceivable circumstance will not be the sole basis for a finding of unfitness." AR 813 (citing generally SECNAVINST 1850.4E); *see also* SECNAVINST 1850.4E encl. 3, § 3202(f) ("The inability to meet screening criteria for a specific assignment or administrative requirement; i.e., deployment, overseas or sea duty assignment, or participation in [Physical Readiness Test ("PRT")/Physical Fitness Test ("PFT")] cycle, does not justify referral.").[8]

Mr. O'Hare responds that his real duties required providing medical care in emergencies, including in combat. *See* Pl.'s MJAR at 27–28; Pl.'s Reply at 8–9. But he cannot avoid the fact that written descriptions of his duties include administrative work. Given, moreover, that this Court defers to the BCNR on questions of fitness, *see, e.g.*, *Heisig*, 719 F.2d at 1156–57; *O'Brien*, 120 Fed. Cl. at 93, it follows that the Court should defer on the definition of a service member's duties. The BCNR's express conclusion — supported by the plain text of Navy regulations — that Mr. O'Hare's administrative activities were within the scope of his duties is thus entitled to deference. *See Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986). Because Mr.

---

[7] The BCNR relied on the job description of a hospital corpsman on the Navy's credentialling website. AR 813, 1060. That description may not have legal force, and it is not clear why the BCNR would rely on it when the Navy has established a hospital corpsman's duties by regulation. *See* Manual of Navy Enlisted Manpower and Personnel Classifications and Occupations Standards 18068F vol. I, ch. 40, HM-3. Be that as it may, the two descriptions are consistent. The regulations, much like the website, provide that hospital corpsmen "assist in the administrative supply and accounting procedures within medical departments ashore[.]" *Id.*

[8] For similar reasons, Mr. O'Hare's PRT/PFT waiver does not mandate a finding of unfitness. Pl.'s Reply 9 n.10.

O'Hare's October 2010 fitness report shows that he excelled at those duties, it supports the Board's conclusion that Mr. O'Hare was fit for duty.

This Court recently remanded a decision of the Navy Informal Physical Evaluation Board ("IPEB") concluding that another hospital corpsman restricted to administrative tasks was fit for duty. *See Nyan v. United States*, 153 Fed. Cl. 234, 245, *vacated in part on reconsideration*, ___ Fed. Cl. ___, 2021 WL 2944593 (2021). But two facts separate that case from Mr. O'Hare's situation. First, the IPEB "did not make any findings regarding what duties a Hospital Corpsman at the E4 grade is expected to perform[.]" *Id.* at 242. Here, the BCNR found that "the Navy assigns corpsmen to naval hospitals to perform clerical and administrative duties, including duties similar to the ones [Mr. O'Hare] performed while on limited duty[.]" AR 813. Second, the IPEB in *Nyan* ignored direct statements — unlike anything in the record here — from physicians and commanding officers that Mr. Nyan was not performing, and was not expected to be able to perform, the duties of a hospital corpsman. 153 Fed. Cl. at 239.

The Board likewise relied on the fact that Mr. O'Hare's assignment to administrative responsibilities reflected *temporary* limitations on his duties. AR 813–14. Mr. O'Hare responds that "the default practice of Navy healthcare professionals is to place all service members on temporary duty no matter how limiting their condition(s)," Pl.'s MJAR at 31, but nothing in the record or regulations appears to support that assertion. In the absence of law or evidence to the contrary, I defer to the BCNR's view of the significance of a limited duty assignment.

Mr. O'Hare argues that the fitness report should not be taken literally because it could not report on medical conditions. AR 814; Pl.'s Reply at 6 n.7. The position is not fully consistent with the record, for Mr. O'Hare's previous report in fact *did* mention his concussion. AR 72. While the regulation he cites does limit "[c]omments pertaining to medical issues," Marine Corps Order P1610.7F, Performance Evaluation System, Ch. 5, § 5001(3)(d)(13), it does not prevent Mr. O'Hare's superiors from commenting on poor performance, even if caused by a medical condition. Ultimately the BCNR is entitled to deference on the interpretation of fitness reports. *See Mendez v. United States*, 540 F. App'x 986, 991 (Fed. Cir. 2013). The BCNR's response — that Mr. O'Hare's strong performance evaluations show he could perform his duties "despite the symptoms [he was] experiencing or the occupational impairments they created," AR 814 — is reasonable.

### 3. Post-Discharge Employment

Finally, the BCNR "considered the evidence of [Mr. O'Hare's] post-discharge employment" in a hospital emergency room, as discovered by the author of one of the

advisory opinions the BCNR obtained on remand. AR 814. Mr. O'Hare argues that was improper, mainly (1) because the BCNR had no authority to investigate Mr. O'Hare's post-military record, and (2) because there was no evidence that Mr. O'Hare's emergency room responsibilities resembled those of a hospital corpsman. Pl.'s MJAR at 32–33; Pl.'s Reply at 8.

As to the first objection, although the BCNR is not an investigative body, 32 C.F.R. § 723.2(b), it is authorized to request advisory opinions, *see* 10 U.S.C. § 1552(g)(1); 32 C.F.R. §§ 723.3(e)(4), 723.6(c); *see also Jackson v. Mabus*, 56 F. Supp. 3d 1, 9 (D.D.C. 2014), *aff'd,* 808 F.3d 933 (D.C. Cir. 2015). Given that an advisory opinion added information about Mr. O'Hare's post-discharge employment to the record, nothing prevents the BCNR from considering it. On the contrary, the BCNR was required to consider all relevant evidence in the record, whatever its source. *Wyatt v. United States*, 23 Cl. Ct. 314, 321 (1991) (citing *Citizens to Preserve Overton Park,* 401 U.S. at 416). The BCNR had authority, at its own discretion, to request additional information from Mr. O'Hare in response to the advisory opinion. *See* 32 C.F.R. § 723.6(a)(2). But Mr. O'Hare also had the opportunity to submit information on his own initiative. *See* Pl.'s MJAR at 33; *see* AR 1055–56. It makes no sense for him to complain that the BCNR did not specifically request information from him on that topic.

As to Mr. O'Hare's other objection, the BCNR acknowledged that "it lacked specific information regarding" Mr. O'Hare's civilian emergency room duties, AR 814, but nonetheless declined to discount the information altogether. The BCNR appears to have assumed that civilian emergency room responsibilities, with the job titles Mr. O'Hare claimed, are at least comparable to medical care responsibilities of a hospital corpsman. That assumption is not obviously unreasonable.[9] Although Mr. O'Hare claims that the jobs are "not even remotely comparable," Pl.'s MJAR at 33, he declined the opportunity to submit evidence to the contrary. His related objection — that he was "only able to work in his current position thanks to years of post-discharge

---

[9] According to Mr. O'Hare, a hospital corpsman's duties "include performing patient assessments, providing patient transport, engaging in wound and incision care, monitoring vital signs, administering intramuscular subcutaneous and intradermal, monitoring fluid intake and output, creating medical or dental records, and operating heavy medical equipment." Pl.'s MJAR at 27. Performing those duties requires a hospital corpsman to "engage with a diverse range of patients … in stressful situations in which … quick thinking and sound judgment mean[] the difference between life and death[.]" *Id.* at 27–28. Performing those duties involves "immense stress[]" because it requires a member "to confront the significant injury and death of others," and it can demand great physical strength and courage. *Id.* at 28. With the exception of the personal risk to a hospital corpsman in combat — which only seems especially likely on deployment — it is difficult to imagine that an emergency room nurse does not perform tasks, and face demands, similar to those Mr. O'Hare describes.

cognitive therapy that he received through the VA following his discharge from the Navy," *id.* — contradicts the record, which shows he began civilian emergency room work the month after discharge. AR 1048. Given that it was Mr. O'Hare's burden to show entitlement to medical retirement, AR 815; *Boyer v. United States*, 81 Fed. Cl. 188, 196 (2008), *aff'd*, 323 F. App'x 917 (Fed. Cir. 2009), his objections go only to the weight of the evidence, not whether it was reasonable for the BCNR to treat it as "reinforc[ing]" the Board's conclusion. AR 814.

### *4. Other Evidence*

Mr. O'Hare argues that, notwithstanding the reasons the BCNR gave for its decision, the medical evidence in the administrative record shows he was unfit. Pl.'s MJAR at 26–28. I have considered all the evidence in the record, as substantial-evidence review requires. *See Dixon v. Dep't of Transp., F.A.A.*, 8 F.3d 798, 804 (Fed. Cir. 1993) ("Because the substantiality of evidence must take into account whatever in the record fairly detracts from its weight, we must canvass the entire record." (quoting *Spurlock v. Dep't of Justice*, 894 F.2d 1328, 1330 (Fed. Cir. 1990) (quotes and alteration omitted))); *Heisig*, 719 F.2d at 1157 ("Under the substantial evidence rule, *all* of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."). The BCNR's conclusion is reasonable in light of the entire record.

Under Mr. O'Hare's interpretation, the record shows that he experienced debilitating symptoms from the time of his injury onward. Pl.'s MJAR at 26–27. He claims there is "no doubt" that those symptoms "prevented [him] from safely and effectively performing even the most basic duties of a hospital corpsman[.]" *Id.* at 27. At the time of discharge, he received a VA disability rating of 40 percent for his TBI. AR 749. In Mr. O'Hare's telling, his second period of limited duty in 2010 was not a temporary state, but a belated acknowledgement that he was unable to perform his duties. *Id.* at 24–25. His separation physical, he argues, was an aberration contradicted by other medical evidence. Pl.'s Reply at 4.

In fact, the medical evidence is mixed. Although Mr. O'Hare had repeated contacts with the military medical system in 2010, many of which identified symptoms of his TBI and PTSD, medical providers appear to have regarded him as a functioning service member in need of medical treatment, not as unfit for duty. AR 104. Several specialists released him "without limitations" after examining him. AR 202, 217, 227. At least one referred to his conditions as "mild." AR 104. As noted above, his self-reported condition varied considerably; at times he reported that he had no difficulty performing his duties. AR 142, 801.

His VA disability rating does not prove Mr. O'Hare was unfit because VA ratings and naval fitness determinations are separate evaluations that serve distinct purposes. "Disability rating determinations by the Navy are 'designed to determine unfitness to perform the duties of office …. In contrast, the VA determines disability ratings based upon an evaluation of whether and how an individual's capacity to perform in the civilian world is diminished by a disability.'" *Lewis v. United States*, 476 F. App'x 240, 245 (Fed. Cir. 2012) (alterations in original) (quoting *Champagne v. United States*, 35 Fed. Cl. 198, 211–12 (1996)). The Federal Circuit rejected a nearly identical argument in *Heisig*: "[T]he fact of a 40 percent disability rating under the Veterans Administration's standards did not mandate a similar finding under service standards, but was evidence to be, and which was, considered along with all other evidence." 719 F.2d at 1157.

On a blank slate, Mr. O'Hare's version of events would be plausible. Plainly, Mr. O'Hare's injury carried troubling symptoms that required — and received — regular medical attention. The problem is that under this Court's standard of review, he must not only present a plausible interpretation of the record, but demonstrate that a "reasonable mind" could not accept the Board's contrary conclusion. *Perales*, 402 U.S. at 401. His showing does not reach that level.

### C. The BCNR's Decision Moots Mr. O'Hare's Request for DES Referral

Mr. O'Hare also challenges the BCNR's conclusion that the Navy was required to refer him to DES processing. He argues that referral was required by the applicable regulation, DoDI 1332.38, E3.P1.6.1. It is not necessary to reach the regulatory interpretation argument because the Board's decision on Mr. O'Hare's fitness moots the question.[10]

The issue is complicated by the fact that both Mr. O'Hare and the BCNR relied on the wrong version of the regulation. Mr. O'Hare's briefing in the BCNR relied on the version that was superseded in 2008. The BCNR quoted that version in rejecting Mr. O'Hare's claim. AR 812. The error is disappointing, to say the least. The BCNR is bound by its own regulations. *Murphy*, 993 F.2d at 873. Courts assume that it "possesses particular expertise in reviewing applications for correction of records and in applying the appropriate Navy regulations." *Smith v. Dalton*, 927 F. Supp. 1, 10 (D.D.C. 1996). At the very least, when adjudicating claims for disability retirement, the BCNR should act like any other adjudicator, *i.e.*, with an awareness of its independent obligation to "ascertain and apply the correct law." *Cf. Sudan v. U.S.*

---

[10] Mr. O'Hare's arguments about the disability rating he would have received had he been processed through the DES are moot as well. Pl.'s MJAR at 34–35. Only unfitting conditions are rated by the Navy. *See* 10 U.S.C. § 1201(a), (b)(3)(B); SECNAVINST 1850.4E encl. 3 § 3801(a) (Apr. 30, 2002).

*Postal Serv.*, 135 F.3d 778, 1998 WL 43178, *2 (Fed. Cir. 1998) (Newman, J., dissenting). The BCNR does itself no credit by blindly following a claimant's erroneous citation to superseded regulatory language.

Contrary to the parties' arguments, I cannot find that the error is inconsequential. The two versions of the regulation set out textually distinct standards for DES referral. The superseded one provided that members should be referred to DES "as soon as the probability that they will be *unable to return to full duty* is ascertained and *optimal medical treatment benefits have been attained*," and that referral should occur "within one year of the diagnosis of [members'] medical condition *if they are unable to return to military duty*." DoDI 1332.38, E3.P1.6.1 (Nov. 14, 1996) (emphasis added). The new one provides a different standard and a different deadline: It directs referral "when a member's progress appears to have *medically stabilized* (and the *course of further recovery is relatively predictable*) and when it can be reasonably determined that the member is *most likely not capable of performing the duties* of his office, grade, rank or rating," and requires referral "within 1 year of being diagnosed with a *medical condition(s) that does not appear to meet medical retention standards*[.]" DoDI 1332.38, E3.P1.6.1 (Oct. 14, 2008) (emphasis added). Those versions *may* be equivalent in meaning, but that would disregard the ordinary presumption that changes in language also change meaning. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 40 (2012); *see also Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005) (noting that a court "construe[s] a regulation in the same manner as we construe a statute"). Ordinarily, an oversight like Mr. O'Hare's and the BCNR's would call for a second remand for reconsideration under the correct standard.

Here, however, remand is unnecessary. Whatever the standard for DES referral might be, the point of DES processing is to identify members who are no longer fit for duty, *see* SECNAVINST 1850.4E encl. 1, §§ 1004(a), § 3102(a), not to process individuals who have already separated, let alone to determine whether former members were fit or unfit at the time of separation years earlier. That is the function of the BCNR, which is empowered to make determinations of fitness with or without DES processing. *Sawyer*, 930 F.2d at 1581 ("[I]n disability cases either the review boards or the correction board is competent to make a disability determination in the first instance."); *Patterson v. United States*, 44 Fed. Cl. 468, 471 (1999), *aff'd*, 250 F.3d 757 (Fed. Cir. 2000) (table). The BCNR has made such a determination in this case.

Even assuming Mr. O'Hare has shown a procedural error in the Navy's failure to process him, the error is thus harmless "unless it can be shown that the purpose behind [DES processing] went unfulfilled." *See Ferrell v. United States*, 23 Cl. Ct. 562,

568 (1991) (explaining why a failure to provide an informal PEB was not prejudicial). But because the BCNR reasonably determined that Mr. O'Hare was fit — based on all the evidence, including Mr. O'Hare's own submissions — the purposes of DES processing were met. Therefore any error is harmless.[11] *Wagner v. United States*, 365 F.3d 1358, 1361–62 (Fed. Cir. 2004).

Even so, Mr. O'Hare's arguments for DES processing miss the mark. His main theory is that because he was on limited duty one year after his injury, DES referral was mandatory. Pl.'s MJAR at 22–24. He rests that bright-line approach on the superseded regulation requiring referral "within one year of the diagnosis of [members'] medical condition if they are unable to return to military duty." DoDI 1332.38, E3.P1.6.1 (Nov. 14, 1996). He also argues that the BCNR "fail[ed] to engage" his interpretation of the regulation. Pl.'s Reply at 3.

Although its reasoning is not perfectly clear, the BCNR did not ignore Mr. O'Hare's argument. Rather, it (1) reasoned that referral is required "as soon as the probability that [a member] will be unable to return to full duty is ascertained and optimal medical treatment benefits have been attained," AR 812, and (2) concluded that Mr. O'Hare did not meet that threshold. The Board simply adopted a different interpretation of the DES referral standard, albeit without explaining in detail why it rejected Mr. O'Hare's. *See Wronke*, 787 F.2d at 1576; *Bowman*, 419 U.S. at 285–86 ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal citation omitted).

Nor is Mr. O'Hare correct that the regulation's text — in particular, the phrase requiring DES referral "within one year … if [the member is] unable to return to military duty" — rules out the BCNR's resolution.[12] The one-year deadline could place an outer limit on the time for referral once a member meets the underlying referral standard, *i.e.*, not being *expected* to return to full duty in the future after medical treatment has run its course. Or it might require referral after a *continuous* one-year period during which the service member cannot return to full duty. Mr. O'Hare objects that alternatives imply reading additional clarifying words into

---

[11] This Court has on occasion ordered remand for DES processing. *See, e.g.*, *Watson v. United States*, 113 Fed. Cl. 615, 639 (2013), *decision clarified,* 118 Fed. Cl. 266 (2014), *modified,* No. 12-785C, 2015 WL 4914966 (Fed. Cl. Aug. 17, 2015). But where the BCNR has made a fitness determination, it substitutes for the DES process. *See Sawyer*, 930 F.2d at 1581.

[12] It bears repeating that even this dispute concerns an incorrect version of the regulation that did not apply to Mr. O'Hare at the time of discharge. Any arguments Mr. O'Hare might raise as to the new version are forfeited. *See Metz v. United States*, 466 F.3d 991, 996 (Fed. Cir. 2006) (explaining that non-jurisdictional issues are "subject to waiver if a plaintiff fails to raise an argument with respect to it before the Board").

the regulatory language, Pl.'s Reply at 3, but of course his does too: He reads it to mean that members must be referred to DES within one year if they are "unable to return to military duty [*at that time*]." There may be other interpretations unfavorable to Mr. O'Hare as well; the point is that there are several plausible readings under which he would lose, and the BCNR resolved the interpretational question against him. *Cf. DynCorp Int'l, LLC v. United States*, ___ F.4th ___, 2021 WL 3744922, at *9–10 (Fed. Cir. Aug. 25, 2021) (concluding that "[a]lthough it was not documented," the record showed that an agency contracting officer had made a particular determination within the scope of the officer's discretion).

Mr. O'Hare also objects to the evidence the BCNR relied on in support of its decision regarding DES referral. Most of that evidence has been addressed above. The only piece of evidence the BCNR relied on in support of the DES decision, but not its fitness determination, was Mr. O'Hare's June 2010 fitness report. AR 812–13. The report covers Mr. O'Hare's service from June 2009 to June 2010 (*i.e.*, both before and after his injury), but the narrative portion of the report only addresses his service in Afghanistan. AR 72. Mr. O'Hare argues that the report is in fact silent on his service after his injury, and therefore sheds no light on his post-injury fitness. Pl.'s MJAR at 30.

The fitness report praises Mr. O'Hare in the strongest terms and recommends him for early promotion. Although the report emphasizes his service on deployment — as one might expect in a military fitness report — it strains credulity to imagine his superiors describing him in such terms based solely on events months earlier, if his subsequent performance actually suffered in the aftermath of a debilitating injury. *See Porter v. United States*, 163 F.3d 1304, 1316 (Fed. Cir. 1998) (there is a "strong, but rebuttable, presumption that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith" (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979))). Mr. O'Hare's contrary interpretation is only speculation. At any rate, the BCNR is better placed than this Court to interpret the language of a fitness report, and its reasonable interpretation of the evidence prevails. It is not unreasonable to interpret the fitness report as covering the entire period, and therefore probative of Mr. O'Hare's post-injury performance.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record is **GRANTED** and Mr. O'Hare's Cross-Motion is **DENIED**. The case is **DISMISSED**.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

                                                  s/ Stephen S. Schwartz  
                                                  STEPHEN S. SCHWARTZ  
                                                  Judge